## Case No. 17,958.

### WOOD v. MORTON.

[See Case No. 17,962.]

## Case No. 17,959.

### WOOD et al. v. The NIMROD.

[Gilp. 83.] [1]

District Court, E. D. Pennsylvania. May 2, 1829.

SHIPPING ARTICLES — CONSTRUCTION — PORTS OF CALL—FORFEITURE OF SEAMAN'S WAGES—ABSENCE—CONFINEMENT FOR MISBEHAVIOR.

1. Where shipping articles authorise the master to touch at certain intermediate ports, "or as he may direct," it is no violation of his contract with the seamen to stop at a place not named, and affords no justification to them for leaving the vessel.

[Cited in The Moslem, Case No. 9,875; Magec v. The Moss, Id. 8,944.]

2. To justify the forfeiture of a seaman's wages for absence, under the provisions of the act of 20th July, 1790 [1 Stat. 131], it is indispensable that there be an entry in the log book of the fact, of the name of the seaman, and of his having gone without leave.

[Cited in The John Martin, Case No. 7,357.]

3. Where a seaman is appointed to act as mate of a vessel, by the master, during the voyage, he may be removed by the master for incompetency, and is not entitled to any other wages than those originally contracted for.

4. Where a seaman is imprisoned for misbehaviour, he does not forfeit the wages accruing during his confinement.

[Cited in The David Pratt, Case No. 3,597.]

HOPKINSON, District Judge. The libellants, [Thomas A.] Wood and [John] Riggins, in this case, shipped on the 5th October last, at New York, on board the brig Nimrod, to perform a voyage, as mariners, from the said port of New York to Darien; thence to St. Thomas; thence to New Orleans, or as the master might direct; and back to New York, her port of discharge, at the wages of ten dollars per month. The brig sailed from New York, proceeded to Darien, went from thence to St. Thomas, thence to Maricaibo, and from Maricaibo sailed for Philadelphia, not going at all to New Orleans, and arrived at this port on the 5th April, 1829. The brig at Maricaibo took in a cargo for Philadelphia, intending, as the mate swears, to proceed to New York after landing that cargo. On the arrival of the vessel at this port the libellants left her, alleging that their contract was broken by the master by bringing the brig here. They

have now sued for the wages up to the 5th April, the time of their arrival here.

On the part of the owners of the brig this claim is resisted, on the ground that the libellants, by deserting the vessel before the termination of the voyage, have severally forfeited their wages. Whether this contract was broken and terminated, or not, by coming to Philadelphia, depends upon the meaning and construction of the shipping articles. The voyage of the contract is there described to be from New York to Darien, thence to St. Thomas, and thence to New Orleans, or "as the master may direct," and back to New York. The brig went from St. Thomas to Maricaibo, omitted New Orleans altogether, and sailed from Maricaibo for Philadelphia with a cargo, intending afterwards to proceed on to New York. The libellants contend that the captain [Neal], having substituted Maricaibo for New Orleans, was then bound to return directly to New York, and that his coming to Philadelphia was a violation of the contract, which discharged them from their obligations under it. The phrase is not to New Orleans, "and" as the master may direct, but "or"; it was not therefore compulsory on the master to go to New Orleans; and he did not. But was he restricted to one other port in the place of New Orleans, if he should not choose to go there? The contract does not say so. At St. Thomas the future prosecution of the voyage is left, under just and reasonable limitations, much to the discretion of the master; and there probably was good reason for doing so. We must give the terms of the contract their natural and obvious meaning, neither restraining them unreasonably, nor taking a latitude oppressive and unjust. At St. Thomas this brig is to be under the direction of the master; the libellants are to go with her to New Orleans, or "as the master may direct" them to go; and not to such other port as he shall direct. The terms are as broad as if it had been "or elsewhere." Under a phrase so broad, how can the libellants claim to limit the power given by it to the going to Maricaibo? Under the decisions that have been made on the meaning of "elsewhere," we will take care that these general expressions shall not have a construction obviously extravagant, unjust and impolitic, as was attempted in some of the cases that may be cited. Surely the respondent in this case does not ask for any such latitude, or unreasonable use of the liberty given to him in the contract. It is agreed that he might go to some other place than New Orleans; and there is no complaint of the substitution of Maricaibo. What further has been done by the master, under his power to proceed from St. Thomas as he might choose to direct? From Maricaibo, instead of sailing directly for New York, he stopped at Philadelphia to discharge a cargo taken in for that port; this would have been done in a few days, and the brig would have pur-

sued her course to New York, if it had not been prevented by the desertion of the libellants. Is this such an unreasonable and oppressive use of the liberty given to the master, by the contract, as will justify these men in abandoning their duty, and leaving the vessel and her cargo to their fate; thereby preventing the very thing they affected so much to desire, that is, to be taken to New York, the place at which they shipped, and to which they were to return? I cannot but consider this as a mere pretext. They did not leave the vessel because she came to Philadelphia, and they wished to go to New York; but for some other reason and object not disclosed. This imputation upon their motives is much strengthened by the circumstance, that at Maricaibo they knew a cargo was taken in for Philadelphia, and that the brig was coming here: and no hint or objection was made to it by any of them. That was the time to speak if they thought the contract was violated; but they acquiesced; they came willingly here; and as New York was expressly stated to be the termination of the voyage, they could not have supposed the master intended to substitute Philadelphia for it; for indeed he had no right to do so. I have no hesitation in saying that there has been no violation on the part of the master, in coming to Philadelphia; and of consequence, that it affords no justification to the libellants for leaving the brig.

The next question is, as to the consequences of this misconduct on their claim for wages. Are they forfeited? While courts of admiralty are vigilant to correct and punish the irregularities of seamen; and to keep them under subordination to the law, and to their contracts, they avoid, as far as they can, to visit them with the extreme penalty of a forfeiture of all their earnings. They are a strange race of men, and indulgence is given to the habits contracted by an irregular and changing life. Certain it is, that when this forfeiture is demanded, it must be shown to be strictly due. The statute, under which it is claimed, is highly penal: and the terms upon which it is awarded, must be rigorously pursued. Has this been done in the case before the court? By the fifth section of the act of congress, of 20th July, 1790, it is enacted, that if a seaman shall absent himself from the ship without leave of the master, and the mate, or person having charge of the log book "shall make an entry therein of the name of such seaman or mariner, on the day on which he shall so absent himself," etc. On this statute it has been decided and settled, that the entry in the log book is indispensable to prove the absence or desertion of a seaman; that the entry must distinctly state whether the absence was with or without leave; stating that he left the ship is not sufficient. The act, too, expressly requires that the name of the absenting seaman shall be entered in the log book; and where a seaman whose name was Malone, was entered as Miller, Judge Peters doubted its sufficiency, although there was no doubt he was intended, and it was proved he had gone by different names. In this case the entries begin on the 5th April and are continued to the 13th, sometimes stating that "the people went ashore" and sometimes "the people still absent;" but in no instance giving the name of any one of them, or saying whether they were absent with or without leave. There can then be no forfeiture of wages in this case, and it need not be regretted, because, although these men left this vessel in a disorderly and improper manner, there seems to have been no disappointment to the owners, in not getting the brig on to New York; indeed from the prompt manner in which they advertised her for freight from this port, in three days after her arrival, one might presume they made the change without much reluctance and probably without any loss or inconvenience.

What wages are to be paid? To [Joseph] Hussey and [John] Monk from their shipment at St. Thomas to their arrival at Philadelphia, at the rate specified in the articles; deducting of course, whatever sums they are legally chargeable with, as payments or otherwise, which, I understand, will be arranged by the counsel. The claims of Wood and Riggins, are somewhat different. They shipped at New York at wages of ten dollars a month, and severally demand an increase of compensation for reasons they respectively urge.

1. As to Wood. It seems that on the arrival of the brig at Darien, the person, who had been shipped as mate, was turned off for gross misconduct, and the captain was compelled to endeavour to supply his place from the crew. This choice fell on Wood, who was announced by the captain as mate of the vessel, at the wages of twenty-five dollars per month. He continued in his new office about two weeks, when he was removed from it, and returned to his first position before the mast, where he remained doing duty as a seaman for the remainder of the voyage. The reason given for this degradation was, that he was found to be wholly incompetent to perform the duties of the station; that he was repeatedly drunk, and in other respects grossly misbehaved himself; all of which is testified by Marcus Nelson. Wood, pretending, but by no means proving, that he was degraded unjustly and without cause, insists upon holding the master to his second contract, by which he became mate of the brig, and entitled to twenty-five dollars per month. Setting aside at present, the cause of his degradation, I am inclined to think that these temporary appointments, made by the master of a vessel on an emergency, are held at his pleasure; they must necessarily be mere experiments of the success of which he is to judge. As-

suredly such an appointment stands on a very different footing from that of mate, originally shipping as such; making his contract for the office, and for the wages belonging to it. In such a case Judge Peters says (Atkyns v. Burrows [Case No. 618]): "The mate is a respectable officer in the ship, and generally chosen with the consent of the owners; he is under the orders of the master in his ordinary duty; but his contract is not subject to arbitrary control." Even, however, in that case, a mate may be displaced by the master for good causes, to be judged of by the court, which should "be evident, strong and legally important." In Wood's case there can be no question of the right of the master to return him to his first situation in the ship; under the circumstances of an attempt to elevate him, which his own incapacity and misconduct defeated. His pretension for mate's wages from the time of his appointment to the end of the voyage, is altogether untenable, and must be dismissed. I have no better opinion of his claim for mate's wages during the short period he nominally acted in that capacity. I say nominally, for he does not appear actually to have done any thing, he might not, and ought not to have done, as an ordinary seaman. He did not keep the log book; and he could not, being deficient in an important requisite; he could not write. For the same reason he did not and could not take an account of the cargo discharged or taken in. In short the experiment of making a mate of this man totally failed; which, added to his gross misconduct, by drinking and negligence, puts him justly back to his first contract as a common seaman on board the brig, and the wages thereby due to him; and no more. His account must be settled on these principles.

2. Riggins also shipped for ten dollars a month; he claims twelve dollars from a certain period of the voyage. He is not entitled to it. The promise of this increase was made on conditions of good conduct and additional services he never performed. On the contrary, his misbehaviour was so extreme as to make it necessary to imprison him at Darien. He must have his wages at the rate of ten dollars a month. At the same time he must not be charged with the sum paid for a hand in his place, while he was in prison. Judge Peters truly observes, this would be a double punishment for the same offence; a punishment by confinement, and also by a forfeiture of wages; for charging him with the wages of the substitute is the same in effect as forfeiting so much of his own.

Decree: The claim of Thomas A. Wood for mate's wages for part of the voyage is dismissed, and he is to be allowed wages only as an ordinary seaman according to the articles; the claims of Hussey and the other libellants to be settled on the same principles.